1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7   RENEE MAINES,                        Case No. 12-cv-04889-JCS

              Plaintiff,
8                                        **ORDER GRANTING IN PART AND
        v.                               DENYING IN PART MOTIONS FOR
9                                        SUMMARY JUDGMENT;
                                         REMANDING FOR CALCULATION OF
10  COMMISSIONER OF SOCIAL              BENEFITS**
    SECURITY,
11            Defendant.                 **Dkt. Nos. 16, 28**

12  **I.      INTRODUCTION**

13          Plaintiff L.D.M., a minor, with the assistance of her mother, Renee Lucero-Maines, seeks

14  review of the final decision of the Commissioner of the Social Security Administration (the

15  "Commissioner") denying her Application for Supplemental Security Income ("SSI") benefits

16  under Title XVI of the Social Security Act ("SSA").  Plaintiff asks the Court to reverse the

17  Commissioner's denial of benefits and remand with instructions to award benefits or, in the

18  alternative, for additional administrative proceedings.  The parties have filed Cross-Motions for

19  Summary Judgment ("Motions").  For the reasons stated below, both Motions are GRANTED in

20  part and DENIED in part.[1]

21  **II.     BACKGROUND**

22          **A.      Procedural Background**

23          On August 24, 2009, Plaintiff's mother applied for SSI benefits on behalf of the claimant,

24  her daughter, a child under the age of 18, with an alleged disability onset date of January 19, 2006.

25  Administrative Record ("AR") 63.  In her application, Plaintiff's mother claimed Plaintiff was

26  disabled due to "[j]uvenile diabetes type 1 [and] severe food allergies."  AR 74.  The claim was

27  _____

28          [1] The parties have consented to the jurisdiction of the undersigned magistrate judge
    pursuant to 28 U.S.C. § 636(c).

*United States District Court*
*Northern District of California*

1   initially denied on February 4, 2010, *id.* at 51, and denied upon reconsideration on July 15, 2010,

2   *id.* at 56.   On August 31, 2010, Plaintiff's mother filed a written request for a hearing before an

3   Administrative Law Judge ("ALJ").   *Id.* at 61.   A video hearing was held before ALJ Mary L.

4   Everstine on July 25, 2011.   *Id.* at 34-48 (Hearing Transcript).   Plaintiff appeared in person and

5   was not represented.   *Id.* at 36.   Her mother was present as a witness.   *Id.*   On July 29, 2011, the

6   ALJ issued a decision denying benefits, finding that the claimant was not disabled as defined in

7   the SSA since August 24, 2009, the date the application was filed.   *Id.* at 10-12 (Notice of

8   Decision – Unfavorable); 13-19 (ALJ's Decision).   The ALJ's decision became final when the

9   Appeals Council declined review on February 21, 2012.   *Id.* at 3-5.

10           On September 18, 2012, Plaintiff filed this action pursuant to 42 U.S.C. § 405(g), which

11   gives the Court jurisdiction to review the final decision of the Commissioner.   Complaint

12   ("Compl.") ¶ 3.   Plaintiff also submitted a brief entitled "Points and Authorities in Support of

13   Complaint in Opposition to Denial of SSI Disability by Defendant" to supplement the Complaint.

14   Dkt. No. 2 ("Plaintiff's Brief").   On the same day, Plaintiff filed an Application to Proceed *in*

15   *forma pauperis*, which was granted by the Court on October 7, 2012.   Defendant filed an answer

16   to the Complaint on January 24, 2013, along with a certified copy of the administrative record.

17   Dkt. Nos. 13, 14.

18           On February 11, 2013, Plaintiff filed a Motion for Summary Judgment.   Dkt. No. 16

19   (Plaintiff Motion for Summary Judgment, Remand and Reply) ("Plaintiff's Motion").   On June 21,

20   2013, Defendant filed a Cross-Motion for Summary Judgment.   Dkt. No. 28 (Defendant's Notice,

21   Motion, and Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition

22   to Plaintiff's Motion for Summary Judgment) ("Defendant's Motion").   Plaintiff filed a reply brief

23   on September 30, 2013.   Dkt. No. 42 (Plaintiff Response to Defendant's Cross-Motion for

24   Summary Judgment) ("Plaintiff's Reply").

25           **B.**      **Plaintiff's Background**

26           Plaintiff was born on February 11, 2004.   AR 70.   She was twenty-three months old on the

27   alleged onset date of her disability, January 19, 2006.   *Id.*   Plaintiff was five-years-old, a preschool

28

United States District Court
Northern District of California

2

child,[2] on August 24, 2009, the date Plaintiff's mother filed an application for SSI. *Id.* at 79. When the hearing before the ALJ took place on July 25, 2011, as well as when the ALJ's Decision was issued on July 29, 2011, Plaintiff was seven years old. *Id.* at 13, 34. She is currently a school-age child, age nine. *Id.* at 40.

### C.    The Administrative Record

On January 19, 2006, Plaintiff was admitted to the intensive care unit ("ICU") at the Santa Barbara Cottage Hospital in Santa Barbara, California with evidence of "new-onset diabetes, including polyuria, polydipsia, weight loss, and hyperglycemia." AR 118. Upon admission, Drake Paul, M.D., diagnosed Plaintiff with "[n]ew-onset diabetes mellitus and diabetic ketoacidosis." *Id.* Dr. Paul commented in Plaintiff's Discharge Summary that generally, Plaintiff "is in no acute distress. Is alert and is active. Is well-developed, well-nourished." *Id.* The Discharge Summary also noted that Plaintiff's "parents have been well educated and instructed on how to care for [Plaintiff's] diabetes and continue to do the Accu-Cheks and insulin by themselves with nursing supervision here in the hospital and have shown proficiency in that regard." *Id.* at 119. Specifically, Plaintiff's parents were to "continue their current regimen of 2 units of Lantus nightly," "a Humalog carbohydrate count with meals only, of 1 unit for every 15 grams of carbohydrate after the meals," and "Accu-Cheks q.a.c. and nightly as well an early morning, 2 to 3 a.m., Accu-Chek." *Id.*

Between May 4, 2007 and April 21, 2010, Elena R. Regala, M.D., treated Plaintiff twelve times. AR 150-58. Dr. Regala's notes show treatment for Plaintiff's flu, runny nose, cough, ear ache, etc. *Id.* at 151-53. The records from September 2009 to December 2009 note that Plaintiff was to be administered insulin shots six to eight times per day. *Id.* at 154.

On November 9, 2007, while on a family vacation in Lake Tahoe, California, Plaintiff developed a "mild pruritus" after she ate a muffin containing banana, coconut, and walnuts. AR 122. Plaintiff subsequently had difficulty "eating . . . yogurt" and "clearing her throat." *Id.* She

---

[2] "Preschool child" (age 3 to attainment of age 6) and "school-age child" (age 6 to attainment of age 12) are terms of art under the Code of Federal Regulations. *See* 20 C.F.R. 416.926a(k)(2)(iii) and (iv).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    complained of a mild "lump in the throat" sensation.  *Id.*  Plaintiff's parents discovered a few,

2    scattered urticarial lesions on Plaintiff while they were bathing her, but did not observe any

3    breathing problems.  *Id.*  The parents attempted to treat the lesions with Benadryl and a topical

4    corticosteroid.  *Id.*  However, because the symptoms did not resolve, Plaintiff's parents took

5    Plaintiff to the emergency department.  *Id.*  There, she was treated with antihistamine and an

6    aerosolized bronchodilator, but did not require injected epinephrine.  *Id.*  Plaintiff's symptoms

7    were completely resolved the next day.  *Id.*

8         On December 10, 2007, Randy P. Johnson, M.D., evaluated Plaintiff for food allergies.

9    AR 122-24.  Dr. Johnson placed a skin testing panel to food allergens, which showed "large

10   positive reactions . . . to walnut and shrimp[,]" and "[s]maller positive reactions [that] may not

11   correlate clinically . . . to egg, peanut, pecan, cashew, and hazelnut."  AR 123.  Dr. Johnson

12   diagnosed Plaintiff with "[f]ood allergy" and "[t]ype 1 diabetes," and prescribed an EpiPen Jr.

13   containing "epinephrine to be used as needed for any symptoms of anaphylaxis."  *Id.*  Plaintiff's

14   "family was instructed to withhold tree nuts."  *Id.*

15        On March 31, 2008, Plaintiff was treated at the Comprehensive Childhood Diabetes Center

16   of Children's Hospital Los Angeles ("CHLA").  AR 181-90.  In his Diabetes Visit Form, Harry

17   McCarthy, RN/CDE, noted that all of Plaintiff's body systems and physical examination were

18   "normal."  *Id.* at 182.  RN McCarthy noted that Plaintiff's hemoglobin A1c level measured 8.8%,

19   a drop from the last count of 9.1% on December 3, 2007.  *Id.* at 183; 188.  He also noted that

20   Plaintiff's blood glucose levels were "high overnight."  *Id.* at 183.  RN McCarthy recommended

21   the treatment and monitoring of Plaintiff's high blood glucose levels.  *Id.* at 186.  He also

22   recommended adjusting Plaintiff's Lantus (long-acting insulin) dosage and rotating insulin

23   injection sites.  *Id.*  The 14-day summary covering from March 13, 2008 to March 26, 2008 shows

24   that there were twelve episodes of hypoglycemia (low blood sugar), indicated by glucometer

25   readings below the hypoglycemic threshold of 67 mg/dL.  *Id.* at 189-90.  There were 101 readings

26   over this period.  *Id.* at 189.  The summary also indicates that only 38% of the blood sugar

27   readings were within the personal target range.  *Id.*  Specifically, of the 101 readings, 49 readings

28   exceeded the target range due to high blood sugar, while 2 readings were below the target due to

4

low blood sugar. *Id.*

On October 9, 2008, Janet Leigh Phillips, FNP/CDE, evaluated Plaintiff for an initial consultation. AR 133-34. Ms. Phillips described Plaintiff as "a very sweet and sociable child," and noted that since Plaintiff's initial diagnosis, she had no further hospitalizations or serious illnesses. *Id.* at 133. Ms. Phillips noted that Plaintiff's regiment of insulin is an "interesting" ¼ unit. *Id.* Further, the diabetes regiment consisted of two units of Lantus in the morning and 1 ¾ units in the evening; correction of ¼ unit for 50 points greater than 200, and ¼ for night time correction for 100 points greater than 250, with no snacks. *Id.* Laboratory results showed that Plaintiff's hemoglobin A1c level was 9.2%, up from the previous reading of 8.5%. *Id.* Ms. Phillips spent over an hour with Plaintiff's mother "discussing general education, action of insulin, growth and the need for increased carbohydrates and protein, i.e., snacks." *Id.* Ms. Phillips "congratulated and praised [Plaintiff's mother] for a job well done under difficult circumstances." *Id.* at 134. She also noted in her report that "[i]n California [Plaintiff] had medical insurance. [Mother] applied to Nevada Medicaid but was denied. [Ms. Phillips and Plaintiff's mother] discussed the need to reapply which the norm is here [sic] and also provided other community resources." *Id.*

On January 15, 2009, Kathleen M. O'Connor, M.D., a pediatric endocrinologist, evaluated Plaintiff. AR 129-32. According to her Pediatric Diabetes Clinic Visit Report, Plaintiff's hemoglobin A1c level was 9.3%, up from 9.2% on October 9, 2008. *Id.* at 129. Dr. O'Connor noted that Plaintiff experiences "some lows," when she exhibits "yawn, dizzy." *Id.* Also, Plaintiff had a new bike, and had ballet for one hour on Tuesdays. *Id.* Dr. O'Connor recommended that Plaintiff's parents cut out snacks for the children, which had been recently added for afternoon exercise. *Id.* She noted "EpiPen Jr.," "Lantus," and "Humalog" as Plaintiff's medication. *Id.* Plaintiff's physical examination was "normal." *Id.* at 130. Dr. O'Connor diagnosed Plaintiff with Type I Diabetes Mellitus, poor control. *Id.* According to the Onetouch Zoom Pro Logbook, over the period from December 17, 2008 to January 15, 2009, Plaintiff had further episodes[3] of

_____

[3] Due to the poor visual quality of the Onetouch Zoom Logbook report, the Court could only discern four episodes. AR 131-32. Plaintiff's mother contends that there were "ten episodes

1    hypoglycemia. *Id.* at 131-32.

2         On April 23, 2009, Dr. O'Connor and Ms. Phillips assessed Plaintiff again. AR 125-26

3    (Report of Ms. Janet Leigh Phillips); 127-28 (Report of Dr. Kathleen O'Connor). Ms. Phillips's

4    report from that date reveals that Plaintiff's hemoglobin A1c level was "10.2%+," up from 9.3%

5    on January 15, 2009. *Id.* at 125. Both reports show that the physical examination of Plaintiff was

6    "normal," and indicate that Plaintiff was diagnosed with Type I Diabetes Mellitus, poor control.

7    *Id.* at 126, 128. Dr. O'Connor prescribed Humalog (short acting insulin) and Lantus (long acting

8    insulin) to be taken at specific time intervals and corrected as needed. *Id.* at 127.

9         On May 5, 2009, Kevin Windisch, M.D.,[4] of RL Sparks Pediatric and Adolescent

10   Medicine, performed a "5 Year Well Child Exam" of Plaintiff. AR 139-42. Dr. Windisch's

11   Encounter Record and Progress Note states that Plaintiff was "slated to start kindergarten" in

12   September 2009; had "multiple allergies" and "carried an epipen"; and "since diagnosis [of poorly

13   controlled type I diabetes at the age of 2, Plaintiff's] sugars have included high Hemoglobin

14   A1c's." *Id.* at 139. Dr. O'Connor noted that Plaintiff had "not required admission since initial

15   diagnosis." *Id.* Plaintiff's physical examination was "normal." *Id.* at 141-42. Dr. O'Connor

16   diagnosed Plaintiff with type 1 diabetes, poor control and "multiple food allergies." *Id.* at 142.

17   He opined:

18              [Plaintiff] will require ongoing medical management for this illness
                for the rest of her life. If managed aggressively she will have a
19              normal lifespan but if allowed to be uncontrolled, [Plaintiff] will be
                a grave risk for Myocardial Infarct, Cerebro Vascular Accident,
20              Renal Failure, death from ketoacidosis and limb loss due to poor
                blood flow. She will need to be treated with multiple medications,
21              follow with endocrinology and check her blood sugar frequently.

22   *Id.*

23        On May 6, 2009, April Henry, M.D.,[5] reviewed Plaintiff's medical record and determined

24   that Plaintiff's "impairment or combination of impairments is severe, but does not meet, medically

25   ────────────────────────────────────────────

26   of hypoglycemia within the monthly period between December 17, 2008 and January 14, 2009"
     according to the same report. Plaintiff's Brief at 3.
          [4] According to Defendant's Motion, Dr. Windisch is a pediatrician. Defendant's Motion at
27   7.

          [5] According to Defendant's Motion, Dr. Henry is a State agency medical consultant.
28   Defendant's Motion at 8.

equal, or functionally equal the listings," 20 C.F.R. § 404, Subpt. P, App. 1.  AR 143-48.  Dr.

Henry further opined that Plaintiff had no limitations in four out of six functional equivalence

domains: acquiring and using information; attending and completing tasks; moving about and

manipulating objects; and in the ability to care for herself.  *Id.* at 145-46.  Dr. Henry appears to

have no response to the domain "interacting and relating with others" in her Childhood Disability

Form.  *Id.* at 143-48.  Dr. Henry opined that Plaintiff had less than marked limitation in the

domain of health and physical well-being, based on her diabetes mellitus in poor control, food

allergies, and normal growth curve.  *Id.* at 146.

On September 23, 2009, Cathy Baker, Plaintiff's kindergarten teacher, completed a teacher

questionnaire for child disability requested by the State Department of Social Services.  AR 90-97.

Ms. Baker indicated that she had observed no problems in any of the six domains of functioning.[6]

*Id.* at 91-96.  She did not know whether Plaintiff was prescribed medication, and indicated that

Plaintiff did not frequently miss school due to illness.  *Id.* at 96.

On December 30, 2009, M. Nawar, M.D.,[7] reviewed the medical evidence of record.  AR

159-65.  Dr. Nawar concluded that Plaintiff's impairments, while severe, did not meet, medically

equal, or functionally equal the listings.  *Id.* at 160.  Specifically, Dr. Nawar opined that Plaintiff

had no limitations in four out of the six functional domains: acquiring and using information,

attending and completing tasks, interacting and relating with others, and moving about and

manipulating objects.  *Id.* at 163.  Dr. Nawar noted that Plaintiff had a less than marked limitation

in the domain for caring for herself and marked limitation in the domain of health and physical

well-being based on her diabetes mellitus in poor control, normal growth, and "unlimited

functioning."[8]  *Id.*

On February 23, 2010, Plaintiff was treated at the Comprehensive Childhood Diabetes

Center of the Children's Hospital Los Angeles.  AR 175-80.  Dr. Kim's review of Plaintiff's

---

[6] As discussed below, the six domains of functioning are listed in section 416.926a(b)(1) of Title 20 of the Code of Federal Regulations.

[7] According to Defendant, Dr. Nawar is a State agency medical consultant.  Defendant's Motion at 9.

[8] The definitions of "less than marked" and "marked" are discussed below.

systems and physical examination were normal. *Id.* at 176. She noted in her report that Plaintiff's

hemoglobin A1c level had decreased to 9.9% from the previous reading of 10.2% in April 2009.

*Id.* at 177. Dr. Kim also noted that Plaintiff had no recorded incidents of severe hypoglycemia

since her last visit. *Id.* L. Brancale, RN/CDE, noted in her report that Plaintiff was working on

"improving control" by testing blood glucose levels a minimum of four times per day, rotating

insulin injection sites, and logging blood glucose counts and calling Ms. Brancale in three days for

a dose adjustment. *Id.* at 179. Ms. Brancale also noted in her Patient Education Documentation

that Plaintiff's mother, the "sole care-giver," "requires ongoing support" and that she "needs help

obtaining medical coverage . . . ." *Id.* at 180.

On April 27, 2010, Dr. Kim and Ms. Brancale treated Plaintiff again. AR 167-71. On

Plaintiff's Diabetes Visit Form, Dr. Kim noted that Plaintiff was "really active on [her] bike." *Id.*

at 167. Dr. Kim's review of Plaintiff's systems and physical examination were normal. *Id.* at 168.

Plaintiff's hemoglobin A1c level was 10.1% (reference range 3-6%), up from her previous reading

of 9.9%. *Id.* at 169. Dr. Kim noted that Plaintiff's "Mom does lunch [insulin] shot[s]" at noon.

*Id.* Dr. Kim also reported that Plaintiff had not experienced severe hypoglycemia since her last

visit. *Id.* Dr. Kim indicated that Plaintiff has "psychological issues," specifically, "some chaos."

*Id.* at 170. According to Dr. Kim, Plaintiff had high blood sugar levels at lunchtime "if [she had a]

big . . . snack," and that Plaintiff needs either a snack or a shot in the mid-morning. *Id.* Dr. Kim

and Ms. Brancale both recommended that Plaintiff's blood sugar levels be tested more frequently,

and that Plaintiff's blood sugar levels be rechecked after treating a low level or correcting a high

level. *Id.* at 170-71. Ms. Brancale indicated in Plaintiff's Patient Education Documentation that

"[Plaintiff's mother] is overwhelmed but doing as best she can," and that she "is a single parent

caring for [two] children [with] diabetes." *Id.* at 171. In a separate report submitted as the same

exhibit, a health professional indicated that an obstacle to treatment compliance for Plaintiff was

"forgetting shots." *Id.* at 172. The report also noted that Plaintiff "attends [kindergarten] and is

doing well academically. [Plaintiff] is physically active, [Plaintiff] likes to color and play with

peers. [Plaintiff's mother] involved and supportive." *Id.* A fourteen-day summary covering the

period between April 14, 2010 and April 27, 2010 showed that four out of forty-four glucometer

1   readings were below the hypoglycemic threshold of 67 mg/dL.  *Id.* at 173-74.  However, only 18%

2   of the blood glucose readings were within the personal target for Plaintiff.  *Id.* at 173.  The

3   majority of readings, 31 out of 44 readings, were above the Plaintiff's personal target blood

4   glucose level due to high blood sugar.  *Id.*

5          On July 12, 2010, K. Quint, M.D.,[9] reviewed all of the medical evidence and completed a

6   Childhood Disability Evaluation Form.  AR 191-95.  Dr. Quint concluded in the report that

7   Plaintiff had an impairment or combination of impairments that is severe, but it does not meet,

8   medically equal, or functionally equal any of the listed impairments.  *Id.* at 191.  Specifically, Dr.

9   Quint indicated that Plaintiff had no limitations in five out of six domains of functional

10  equivalency.  *Id.* at 193.  Dr. Quint indicated that Plaintiff had a less than marked limitation in the

11  domain of health and physical well-being because she "[h]as juvenile onset diabetes," and had no

12  limitation in the domains of moving about and manipulating objects and caring for oneself.  *Id.*

13         On October 21, 2010, Kathleen M. O'Connor, M.D., treated Plaintiff's diabetes and

14  completed a Progress Note.  AR 205-06.  Plaintiff's meter showed there were three to four blood

15  glucose level readings being taken per day, with "[s]ome scattered lows associated with busy

16  times."  *Id.* at 205.  Dr. O'Connor noted that Plaintiff's blood sugar levels "later in [the] day [were

17  not] as good as" her morning levels.  *Id.*  She also noted that Plaintiff "[g]ets shots after meals."

18  *Id.*  Dr. O'Connor opined that aside from a "bump on [Plaintiff's] buttock that needs [to be]

19  checked," she was "normal" and "healthy looking."  *Id.*  Dr. O'Connor assessed Plaintiff with

20  "[d]iabetes mellitus without mention of complication, type I (juvenile type), uncontrolled – 250.03

21  (Primary)," and "cellulitis of injection site."  *Id.*  Dr. O'Connor's treatment consisted of the

22  continuation of Lantus Solution and Humalog KwikPen Solution.  *Id.*  Plaintiff's hemoglobin A1c

23  reading was 9.5%, down from her previous reading of 10.2% on April 23, 2010.  *Id.*

24         On January 20, 2011, Plaintiff returned to Dr. O'Connor for follow-up treatment of her

25  diabetes.  AR 203-04.  Plaintiff's meter showed there were three to six glucose blood glucose level

26

27         [9] According to Defendant, Dr. Quint is a State agency medical consultant.  Defendant's
28  Motion at 10.

United States District Court
Northern District of California

1   readings being taken per day.  *Id.* at 203.  Dr. O'Connor noted that Plaintiff's "[n]umbers" were

2   "erratic," and that there was "[n]o pattern."  *Id.*  Plaintiff appeared to continue to "[t]ake shots

3   after she eats."  *Id.*  Dr. O'Connor noted that Plaintiff was taking ballet once per week and was

4   participating in Girl Scouts twice per month.  *Id.*  Dr. O'Connor concluded from a general

5   examination of Plaintiff that her general appearance was "normal" and "healthy looking."  *Id.*  Dr.

6   O'Connor assessed Plaintiff with "[d]iabetes mellitus without mention of complication, type I

7   (juvenile type), uncontrolled – 250.03 (Primary)."  *Id.*  Dr. O'Connor's treatment consisted of the

8   continuation of Lantus Solution and Humalog KwikPen Solution.  *Id.*  Plaintiff's hemoglobin A1c

9   reading was 9.1%, down from the previous reading of 9.5% on October 21, 2010.  *Id.*

10          On February 4, 2011, Dr. O'Connor completed a Functional Assessment for Children

11  Form, in which she assessed Plaintiff's functionality within each of the six domains.  AR 198-200.

12  In the domain of acquiring and using information, Dr. O'Connor concluded that Plaintiff had a

13  moderate limitation.  *Id.* at 198.  She commented that Plaintiff's "self-management is limited by

14  her age.  She is not old enough yet to count carbohydrates, decide on insulin dose, and give

15  injections independently.  Her mother must provide/supervise all care of her Type 1 Diabetes."  *Id.*

16  In the domain of attending and completing tasks, Dr. O'Connor indicated that Plaintiff had a

17  moderate limitation.  *Id.* at 199.  Specifically, Dr. O'Connor commented that "[a]ttention is

18  appropriate for her age; but not yet well-developed enough for self-management of diabetes."  *Id.*

19  In the domain of health and physical well-being, Dr. O'Connor opined that Plaintiff had a

20  moderate limitation.  *Id.* at 200.  To explain her opinion, Dr. O'Connor noted in her form that

21  Plaintiff "must monitor blood sugar and take insulin injections before each meal and/or snack.

22  During exercise [and] heavy activity she must monitor for lows [and] as necessary."  *Id.*  In three

23  of the six domains, interacting and relating with others, moving about and manipulating objects,

24  and personal care, Dr. O'Connor concluded that there was no evidence of limitation.  *Id.* at 199.

25          On April 27, 2011, Dr. O'Connor continued to treat Plaintiff's diabetes.  AR 201-02.

26  Plaintiff's meter showed that there were three to five glucose blood glucose level readings being

27  taken per day.  *Id.* at 201.  Dr. O'Connor noted that there were "some lows," specifically, about

28  four times every two weeks but with "no pattern."  *Id.*  In half the mornings, the readings were

United States District Court
Northern District of California

United States District Court
Northern District of California

1   high, while in the other half of the mornings, the readings were "low normal, 2 lows." *Id.* Dr.

2   O'Connor indicated that Plaintiff's "numbers [were] highly variable." *Id.* She also noted that

3   Plaintiff "sometimes snacks without telling," but that it is "getting better now that they know they

4   won't get in trouble." *Id.* Following a general examination of Plaintiff, Dr. O'Connor concluded

5   that Plaintiff's general appearance was "normal" and "healthy looking," despite a "bad rash in

6   [the] panty area" and "some discomfort" as a result. *Id.* Dr. O'Connor assessed Plaintiff with

7   "[d]iabetes mellitus without mention of complication, type I (juvenile type), uncontrolled – 250.03

8   (Primary)," and "[c]andidiasis of vulva and vagina." *Id.* Dr. O'Connor's treatment consisted of

9   the continuation of Lantus SoloStar Solution and Apidra SoloStar Solution, and start of Diflucan

10   Suspension Recontinued and EMLA Cream. *Id.* Plaintiff's hemoglobin A1c reading was 10.3%,

11   up from the previous reading of 9.1% on January 20, 2011. *Id.*

12        After the ALJ's decision on July 29, 2011 denying Plaintiff SSI benefits, Dr. O'Connor

13   drafted a letter on September 9, 2011, "support[ing] [Plaintiff's] application for disability." AR

14   207. She noted that:

> At her age [Plaintiff] is unable to provide most of her own Diabetes
> care. Her care includes counting carbohydrates every time she eats,
> determining the dose of Insulin required for that amount of food,
> injecting insulin with meals and a longer acting insulin at bedtime,
> monitoring for low and high blood sugars and treating each. . . .
> Younger children aren't as aware as older kids and adults and often
> need assistance to detect and treat low blood sugars. . . . Children on
> average learn to give injections around age 8 [years] old, but
> counting carbohydrates is a skill that takes many years to learn.
> Further still is the fact that children are very concrete thinkers; they
> are unable to think of long term consequences and the daily
> management of Diabetes must be monitored by an adult through
> high school or compliance and quality of care will suffer.

22   *Id.* Dr. O'Connor also opined that "a child with Diabetes can do almost anything a child with no

23   medical problems can do," but "the disability coverage helps pay for the supervision required for

24   her healthcare in a single parent household." *Id.* Dr. O'Connor noted that Plaintiff's "mom is

25   usually required to miss work because there are few sitters capable of managing [Plaintiff's]

26   diabetes." *Id.*

27        Twenty-four weeks into the 2011-2012 school year, Plaintiff's first grade teacher, Ms.

28   Sandi Jensen at G. L. Scarselli Elementary School, completed a Competency Progress Report. AR

116.  Plaintiff's attendance record shows that Plaintiff was present on 144 days, absent on nine days, and tardy on six days.  *Id.*  Her report card demonstrates that Plaintiff's "characteristics of a successful student" were "strong always," in all eleven categories.  *Id.*  Academically, with the exception of two standards in mathematics during the first twelve weeks of school and some standards that were not assessed, Plaintiff was either approaching or met the academic standards.[10]  *Id.*  Plaintiff's first grade teacher commented that she "is a pleasure to have in class.  She plays school well and with continued effort will continue to reach all the goals that have been set for her!"  *Id.*

### D.       The Administrative Hearing

The ALJ held an administrative hearing by video teleconferencing on July 25, 2011.  AR 34-48 (Hearing Transcript).  Plaintiff and her mother were present in the San Luis Obispo, California hearing office, and the ALJ heard the case from Santa Barbara, California.  *Id.* at 36.  The ALJ advised Plaintiff and her mother of the right to representation and the ability to continue the hearing to a later date.  *Id.*  Plaintiff's mother elected to proceed on Plaintiff's behalf.  *Id.*  Because Plaintiff was only seven years old, she did not testify during the hearing.  *Id.* at 38.

Plaintiff's mother testified that Plaintiff was scheduled to start second grade in two weeks.  AR 39.  Through the ALJ's questioning and the testimony of Plaintiff's mother, it was confirmed that Plaintiff has insulin-dependent diabetes, and allergies to walnuts, shrimp, and cephalexin.  *Id.*  Plaintiff's mother testified that all three allergies are severe and that she carries an EpiPen for that reason.  *Id.*  She also testified that Plaintiff's brother, three years old, was also diabetic and that she had a case pending on him "right behind [Plaintiff]" in the Social Security process.  *Id.* at 40.

The ALJ questioned Plaintiff's mother about Plaintiff's performance in school.  AR 40-41.  Plaintiff's mother testified that in first grade, Plaintiff was behind in reading.  *Id.* at 40.  She continued to testify that Plaintiff is still behind for second grade, but she was approaching grade level.  *Id.*  Plaintiff was not in any special programs and was entirely in a mainstream classroom.

---

[10] Specifically, in most academic standards, Plaintiff was awarded either a "3" (Approaching Standard) or "4" (Meets Standard) on a 5-point scale, where "5" is Exceeds Standard.

United States District Court
Northern District of California

*Id.* at 41.  Plaintiff got along well with her peers and adults, and was polite.  *Id.*  Through the

ALJ's questioning, Plaintiff's mother confirmed that Plaintiff is "sweet and social."  *Id.*  The ALJ

questioned Plaintiff's mother about whether Plaintiff was expected to help around the house.  *Id.*

at 43.  Plaintiff's mother testified that Plaintiff assisted with chores, such as feeding the dogs,

emptying the wastebaskets, and making her bed.  *Id.* at 43-44.

On Plaintiff's diabetes, Plaintiff's mother testified that "when [Plaintiff's] sugars are off,

she gets kind of sleepy or she gets moody."  AR 41.  Plaintiff's mother had provided Plaintiff's

teacher with a list of symptoms because "not many people know too much about type 1 diabetes."

*Id.* at 42.  Plaintiff's mother testified that every morning, she tests Plaintiff's sugar levels when

Plaintiff wakes up.  *Id.* at 43.  After breakfast, Plaintiff's mother gives Plaintiff a shot and counts

her carbohydrates before taking Plaintiff to school.  *Id.*  If a problem arises prior to the school

lunch hour, Plaintiff's mother would go to the school, and test and treat as needed.  *Id.*  Plaintiff's

mother testified that typically, she goes to Plaintiff's school every day during the lunch hour to do

her testing, counting of carbohydrates, and shots.  *Id.* at 42-43.  Two hours later, Plaintiff's mother

would pick Plaintiff up when school ended.  *Id.* at 43.  Plaintiff wears a wristband and necklace to

alert others of her diabetes.  *Id.* at 42.  Whenever Plaintiff felt she had a problem during the school

day, she would go to the nurse's office.  *Id.* at 42-43.  Plaintiff's mother explained that the nurse at

school is "just a nurse aide," and thus could not legally test or apply shots to Plaintiff.  *Id.* at 43.

Accordingly, the nurse calls Plaintiff's mother when Plaintiff was not feeling well.  *Id.* at 42-43.

Plaintiff's mother testified that the most limiting aspect of Plaintiff's diabetes was the

administration of tests and insulin shots throughout the day.  AR 44.  According to Plaintiff's

mother, Plaintiff's hemoglobin A1c level should ideally be 7%, but it is currently 10.5%.  *Id.*

Plaintiff's mother also testified that following a recent "little minor ear infection . . . [Plaintiffs]

sugars aren't going down."  *Id.*  Plaintiff's mother testified that "the medication spiked

[Plaintiff's] sugars even more."  *Id.*  She also confirmed that Plaintiff had not been hospitalized

since the initial hospitalization on January 19, 2006, when she was first diagnosed of diabetes.  *Id.*

The ALJ questioned Plaintiff's mother about whether Plaintiff misses school because of

her diabetes.  AR 45.  Plaintiff's mother answered in the affirmative, and added that Plaintiff "had

a lot of sick days last year" and that "last year was the first year [Plaintiff] was there all day long .

. . ." *Id.*  She also added that last "January, February, March [were] just brutal, with the flu bug

and . . . stuff going around." *Id.*  According to Plaintiff's mother, when Plaintiff has a sick day,

Plaintiff's mother must test Plaintiff "every hour on the hour, around the clock, until [Plaintiff's

mother] can bring [Plaintiff's] sugars down." *Id.*

The ALJ asked Plaintiff's mother if there was anything else that was not in the records that

she should know prior to making a decision.  AR 46.  In response, Plaintiff's mother testified that

she was a "single parent taking care of not only [Plaintiff] but [her] son, too," who could not rely

on anyone else to care for them. *Id.*  She further testified that she was thus "not able to go to

work." *Id.*

**E.       The  SSA's Three-Step Analysis to Determine Whether a Minor is Disabled**

Supplemental Security Income ("SSI") is available under Title XVI of the Social Security

Act (the "Act") for an individual under the age of 18 when she is "disabled."  42 U.S.C. §

1382c(a)(3)(C)(i); *see also* 42 U.S.C. § 1381a.  A child is "disabled" if she "has a medically

determinable physical or mental impairment, which results in marked and severe limitations, and

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  *Id.*; *Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir.

2000).  "The claimant bears the burden of establishing a prima facie case of disability."  *Roberts v.*

*Shalala*, 66 F.3d 179, 182 (9th Cir. 1995) (citing *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir.

1992)), *cert. denied*, 517 U.S. 1122 (1996); *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996)

(citation omitted).

The Commissioner has established a three-step sequential evaluation process for the ALJ

to follow when considering the disability application of a minor claimant.  20 C.F.R. § 416.924;

*see, e.g.*, *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1150 (C.D. Cal. 2008)

(applying the three-step sequential evaluation process in a child disability case); *Smith ex rel. Enge*

*v. Massanari*, 139 F. Supp. 2d 1128, 1132 (C.D. Cal. 2001) (same).

At Step One, the ALJ must determine whether the claimant is engaged in "substantial

United States District Court
Northern District of California

gainful activity." *Id.* § 416.924(a).  If the claimant engages in substantial gainful activity, she is not disabled regardless of her medical condition, age, education, or work experience.  *Id.* § 416.924(a)-(b).

If the claimant is not engaged in substantial gainful activity, at Step Two, the ALJ must determine whether the claimant has a "severe" medically determinable impairment or combination of impairments.  20 C.F.R. § 416.924(a).  For a child, a medically determinable impairment or combination of impairments is not severe if it is a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations . . . ." *Id.* § 416.924(c).  If the claimant's impairment(s) is not severe, the child is not disabled, and SSI is denied at this step.  *Id.* § 416.924(a), (c).

If it is determined that one or more impairments are severe, at Step Three, the ALJ must determine whether the claimant's impairments meets, medically equals, or functionally equals an impairment in the Listing of Impairments (the "Listing"), 20 C.F.R. § 404, Subpart P, Appendix 1.  If the claimant's impairment(s) meets or equals an impairment in the Listing, and meets the durational requirement, disability is presumed and benefits are awarded.  *Id.* § 416.924(a), (d).

Step three encompasses two analytical steps.  First, it must be determined whether the claimant's impairments meets or medically equals a Listing.  The mere diagnosis of an impairment in the Listing is insufficient, in itself, to sustain a finding of disability.  *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990); *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).  The impairment must also satisfy all of the criteria of the listing.  20 C.F.R. § 416.925(d).  The Listing for diabetes mellitus is discussed in further detail in the next section.

If the claimant does not meet or medically equal a Listing, she may still be considered disabled if an impairment results in limitations that "functionally equal the listings."  20 C.F.R. § 416.926a(a).  In determining whether the severe impairment(s) functionally equals the listings, the ALJ must assess the claimant's functioning in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  To "functionally equal" the listings, the impairment(s) must

result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id.* § 416.926a(a), (d). In making this assessment, the ALJ must look at "how appropriately, effectively, and independently [the claimant] preform[s] [her] activities compared to the performance of other children [the claimant's] age who do not have impairments." *Id.* § 416.926a(b).

A child has a "marked" limitation in a domain when her impairment(s) "interferes seriously" with her "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). The regulations also provide that "marked" limitations means a limitation that is "more than moderate" but "less than extreme." *Id.* For the sixth domain of functioning, health and well-being, a child has a "marked" limitation if she is frequently ill because of the impairment(s) or has frequent exacerbations of impairment(s) that result in "significant, documented symptoms or signs." *Id.* § 416.926a(e)(2)(iv). "Frequent" is defined as (1) "episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more," or (2) "episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity." *Id.*

A child has an "extreme" limitation in a domain when her impairment(s) "interferes very seriously" with her "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). The regulations also provide that an "extreme" limitation also means a limitation that is "more than marked." *Id.* However, "extreme" limitation does not mean a "total lack or loss of ability to function." *Id.* For the sixth domain of functioning, health and well-being, a child has an "extreme" limitation if she is frequently ill because of the impairment(s) or has frequent exacerbations of the impairment(s) that result in "significant, documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation . . . ." *Id.* § 416.926a(e)(3)(iv). In fact, for an impairment(s) to be "extreme," in most cases, they should "meet or medically equal the requirements of a listing . . . ." *Id.*

**F.      Listing of Impairments**

16

Effective June 7, 2011, Listing 109.08 for juvenile diabetes mellitus was amended to apply only to children under the age of six ("New Listing").  The New Listing states: "Any type of diabetes mellitus in a child who requires daily insulin and has not attained age 6.  Consider under a disability until the attainment of age 6.  Thereafter, evaluate the diabetes mellitus according to the rules in 109.00B5 and C."  20 C.F.R. § 404, Subpt. P, App. 1, Pt. B, § 109.08 (2013).  The SSA Regulation clarifies that it "is only for children with [diabetes mellitus] who have not attained age 6 and who require daily insulin."  *Id*.  For children over six, or for children who do not require daily insulin, the SSA considers whether the diabetes mellitus "is severe, alone or in combination with another impairment, whether it meets or medically equals the criteria of a listing in another body system, or functionally equals the listings under the criteria in § 416.926a, considering the factors in § 416.924a."  *Id*.

In contrast, the Listing that was effective until June 6, 2011 ("Old Listing") was not limited to children under the age of six.  It also required that further criteria be satisfied in addition to requiring daily insulin:

> *Juvenile diabetes mellitus (as documented in 109.00C) requiring parental insulin.* And one of the following, despite prescribed therapy:
> A.  Recent, recurrent hospitalizations with acidosis; or
> B.  Recent, recurrent episodes of hypoglycemia; or
> C.  Growth retardation as described under the criteria in 100.02 A or B; or
> D.  Impaired renal function as described under the criteria in 106.00ff."

20 C.F.R. § 404, Subpt. P, App. 1, Pt. B, § 109.08 (2011).  The documentation requirement of 109.00C for Old Listing stated:

> Description of characteristic history, physical findings, and diagnostic laboratory data must be included.  Results of laboratory tests will be considered abnormal if outside the normal range or greater than two standard deviations from the mean of the testing laboratory.  Reports in the file should contain the information provided by testing laboratory as to their normal values for that test.

*Id*.

//

### G.    The ALJ's Findings of Fact and Conclusions of Law

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The ALJ's found that Plaintiff had never engaged in substantial gainful activity and that

2    Plaintiff's insulin-dependent diabetes and allergies are "severe" impairments.  AR 16.  The ALJ's

3    most important findings were at Step Three.  At Step Three, the ALJ found that Plaintiff does not

4    have an impairment or combination of impairments that meets, medically equals, or functionally

5    equals one of the one of the impairments in the Listing.  AR 17.

6    First, the ALJ held that Plaintiff does not meet or medically equal a Listing.  The ALJ

7    arrived at this conclusion without explaining her analysis.  The ALJ did not discuss whether she

8    applied the New Listing or the Old Listing.  The ALJ only wrote that that "[t]he medical record

9    fails to show listing level severity."  *Id.*

10   Next, the ALJ found that Plaintiff does not have an impairment or combination of

11   impairments that functionally equals an impairment in the Listing because her impairment(s) did

12   not result in either "marked" limitations in two domains of functioning or an "extreme" limitation

13   in one domain.  AR 18-19.  The ALJ found that Plaintiff had a "marked" limitation in the domain

14   of health and physical well-being, but no limitation in the other five domains.  *Id.* at 19.

15   In reaching this conclusion, the ALJ considered "all of the relevant evidence" and the

16   "whole child."  *Id.* at 18.  The ALJ followed a two-step process in considering Plaintiff's

17   symptoms.  *Id.*  First, the ALJ "determined whether there is an underlying medically determinable

18   physical or mental impairment."  *Id.*  Second, the ALJ evaluated "the intensity, persistence, and

19   limiting effects of the claimant's symptoms to determine the extent to which they limit the

20   claimant's functioning."  *Id.*  When considering the evidence, the ALJ placed "significant weight"

21   on the medical records from Children's Hospital Los Angeles from February and April 2010

22   ("Exhibit 12F"), *id.*, although she "carefully reviewed and considered" the opinions of all medical

23   consultants, *id.* at 19.  The ALJ found that those records were "fully credible, based on the length,

24   nature and/or extent of the treating physicians' relationships with the claimant; supportability with

25   medical signs and laboratory findings; consistency with the record; and areas of specialization."

26   *Id.* at 18.  The ALJ cited the findings of the treating physicians in Exhibit 12F, that Plaintiff

27   "performed well academically, was physically active, enjoyed riding her bike, and was well-liked

28   by her peers."  *Id.* at 19.  Further, the ALJ found that the Childhood Disability Evaluation Forms

completed by Dr. Nawar ("Exhibit 10F") in December 2009 and Dr. Quint ("Exhibit 13F") in July 2010[11] to be "persuasive in establishing marked limitation in only one domain, in health and physical well-being." *Id.* The ALJ also found that the medical records put together by Dr. O'Connor were persuasive to a certain extent. *Id.* The ALJ acknowledged Dr. O'Connor's finding regarding no complications in Plaintiff's diabetes, although uncontrolled, and Dr. O'Connor's conclusion that Plaintiff was "normal and healthy looking." *Id.* While acknowledging that Dr. O'Connor opined Plaintiff had moderate limitations in acquiring and using information, attending and completing tasks, and in health and well-being, the ALJ did not credit this finding because "it appears the majority of [Plaintiff's limitations] were related to her young age." *Id.* The ALJ concluded that the assessment by Dr. O'Connor in Exhibit 15F was "partially credible, but not to the extent of establishing disability." *Id.*

In sum, the ALJ found that Plaintiff had a "marked" limitation in the domain of health and physical well-being, but no limitations in the remaining five domains. AR 19. Because Plaintiff did not have an impairment or combination of impairments that result in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, the ALJ concluded that Plaintiff's impairment(s) did not "functionally equal" an impairment in the Listing. *Id.* The ALJ held that Plaintiff had not been disabled, as defined in the Social Security Act, since August 24, 2009, the date the application was filed, and denied Plaintiff benefits. *Id.*

### H.   Letters Submitted Following the Appeals Council Decision

On September 18, 2012, Plaintiff submitted two letters—one from Kathleen M. O'Connor, M.D. and Kathryn Eckert, M.D., and another from Dr. O'Connor only, as exhibits to Plaintiff's Brief.[12]  Plaintiff's Brief, Exs. E, F.  The first letter is from Drs. O'Connor and Eckert, and is dated April 24, 2012, after the hearing before the ALJ (July 25, 2011) and the ALJ's Decision (July 29, 2011).  In this letter, the doctors note that Plaintiff is too young to fully care for all of her needs given her impairment, that Plaintiff's mother struggles to provide all of Plaintiff's need and

---

[11] The ALJ also found "persuasive" the medical record in Exhibit 6F, but no such record exists in the Administrative Record.  AR 19.

[12] The letter is not attached as an exhibit to a declaration, but rather, as an exhibit to Plaintiff's Brief.

United States District Court
Northern District of California

1   requires financial help, and notes the cost of various medical supplies required for Plaintiff's

2   condition.  Plaintiff's Brief, Ex. F.

3          The second letter from Dr. O'Connor, and is dated September 14, 2012, which is also after

4   the hearing and the ALJ's Decision.  The letter states:

> I am the health care provider for [Plaintiff].  She has been a patient
> in our practice in Reno, NV for several years.  [Plaintiff] has Type 1
> Diabetes and throughout her association with me I have witnessed . .
> . recurrent bouts of hypoglycemia, frequent episodes of
> hyperglycemia, and ongoing difficulty with high A1c levels.

8   Plaintiff's Brief, Ex. E.

9          **I.      The Summary Judgment Motions**

10                **1.      Plaintiff's Contentions**

11         Plaintiff contends that the ALJ committed reversible error by: (1) determining that she had

12  not met or medically equaled the criteria for Listing 109.08B for juvenile diabetes mellitus,

13  Plaintiff's Brief at 2-4; (2) finding that Plaintiff did not functionally equal the listings, *id.* at 4-7;

14  and (3) by not considering a case evaluation from a qualified medical professional who specializes

15  in pediatric endocrinology, *id.* at 9-12.  Plaintiff therefore argues that the ALJ's decision should be

16  reversed and the case remanded to the Commissioner for award of benefits, or, in the alternative,

17  further proceedings.

18         First, Plaintiff challenges the ALJ's conclusion at Step Three that Plaintiff's impairments

19  did not meet or medically equal any of the impairments in the Listing.  Plaintiff's Brief at 2-4.

20  Specifically, Plaintiff argues that her impairment (1) meets or medically equals Listing 109.08B

21  for juvenile diabetes mellitus requiring parental insulin and recent or recurrent episodes of

22  hypoglycemia, and (2) satisfies the documentation requirement set forth in 109.00C.  *Id.*  To

23  demonstrate her juvenile diabetes mellitus and recent or recurrent episodes of hypoglycemia,

24  Plaintiff cites glucometer readings from March 2008, December 2008, and April 2010.  *Id.* at 3.

25  Plaintiff argues that the ALJ's failure to credit these readings constitutes legal error.  *Id.*  Further,

26  Plaintiff presents a letter, dated September 14, 2012, from Dr. O'Connor that was not considered

27  by the ALJ nor the Appeals Council that "supports the fact Plaintiff suffered from recurring

28  episodes of hypoglycemia during the subject evaluation timeframe and still experiences recurring

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1    episodes today." *Id.*  Plaintiff argues she satisfied the documentation requirement with "medical

2    records [that] document the conditions of her life-long disease, as substantiated with periodic lab

3    reports, medical examinations, and other certifiable testing data." *Id.*

4           Second, Plaintiff contends that the ALJ committed legal error when she concluded at Step

5    Three that Plaintiff's impairments did not functionally equal any of the impairments in the Listing.

6    Plaintiff's Brief at 4-7.  Specifically, Plaintiff argues that although the ALJ correctly found that

7    Plaintiff had a "marked" limitation in the domain of health and physical well-being, the ALJ

8    should have reached the same conclusion for the domain of caring for yourself.[13]  *Id.* at 4-5, 7.

9    Plaintiff contends that the ALJ should have found that Plaintiff has a "marked" limitation in the

10   domain of caring for yourself because she cannot:

11               (a) [A]dminister . . . medications, including but not limited to giving
                 herself one or more insulin injections; (b) make a quick and accurate
12               determination, as necessary, of the quantity and quality of sugar or
                 other carbohydrates she needs to eat or drink; and (c) perform one or
13               more repeated tests of her blood sugar levels to ascertain the need
                 for either more insulin shots or more food intake in response to how
14               her body has just reacted to the shot(s) and/or ingested food.

15   *Id.* at 5.  Plaintiff argues that Drs. Eckert and O'Connor's observations and reports support the

16   conclusion that Plaintiff has a "marked" limitation under the age group descriptor for school age

17   children (age 6 to attainment of age 12) in the domain of caring for yourself.  *Id.* at 6 (citing 20

18   C.F.R. § 416.926a(k)(2)(iv)).  Plaintiff thus contends that the ALJ committed legal error in finding

19   that Plaintiff's impairments did not functionally equal any of the impairments in the Listing.

20          Third, Plaintiff challenges the ALJ's decision because the only medical records that were

21   considered were from "DDS professionals that are neither Pediatricians nor Diabetes specialists."

22   Plaintiff's Brief at 9-12.  Plaintiff argues that the ALJ's failure to consider evidence from a

23

24          [13] In addition to arguing that the ALJ erred, Plaintiff also appears to contend that the
     evaluators of the Disability Determination Service ("DDS") and Children's Hospital Los Angeles
25   ("CHLA") erred in concluding that Plaintiff had no limitation in the domain of caring for yourself.
     Plaintiff's Brief at 4.  That is because Plaintiff cannot take care of her own health, give herself
26   insulin injections, or test her blood glucose levels.  *Id.*  Plaintiff also contends that "[d]espite three
     separate declarations by DDS evaluators that Plaintiff had no limitations in caring for yourself,
27   [the evaluators have] failed to cite in the record a single incident wherein Plaintiff was either
     tested, observed, or reported to have independently performed any of the specific tasks" in the
28   domain of caring for yourself.  *Id.* at 6.

qualified pediatrician in a child disability case constitutes a violation of the Ninth Circuit's ruling in *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006 (9th Cir. 2003) and 42 U.S.C. § 1382c(a)(3)(I).  Plaintiff's Brief at 10.

### 2.    Defendant's Contentions

Defendant counters each of Plaintiff's contentions.  First, Defendant contends that the ALJ did not err at Step Three by concluding that Plaintiff did not meet or equal any of the impairments in the Listing.  Defendant's Motion at 9-13.  Defendant contends that the Old Listing applies to Plaintiff's claim for the time period prior to the enactment date of June 7, 2011, and that the New Listing applies to the time period thereafter.  Defendant argues that Plaintiff does not meet the criteria of the New Listing because for the time period in which the New Listing applies (starting on June 7, 2011), Plaintiff was older than six.  Defendant also contends that Plaintiff does not meet the criteria of the Old Listing for the time period in which it applies because Plaintiff did not have evidence that she experienced recent, recurrent episodes of hypoglycemic and because the evidence does not meet the documentation requirement.  *Id.* at 11-12.

Second, Defendant contends that the ALJ did not err at Step Three by concluding that Plaintiff's impairments did not functionally equal any of the impairments in the Listing.  Defendant's Motion at 13-17.  Specifically, Defendant rejects Plaintiff's argument that the ALJ should have found that Plaintiff had a "marked" limitation in the domain of "caring for yourself" in addition to the domain of "health and well-being."  *Id.* at 13.  In doing so, Defendant cites provisions of the Code of Federal Regulations and Plaintiff's medical records that suggest Plaintiff's limitations, if any, are due to her young age, rather than any disabling medical condition.  *Id.* at 15.

Third, Defendant claims that the ALJ followed the requirements set forth by the Ninth Circuit in *Howard* and 42 U.S.C. § 1382c(a)(3)(I) because the ALJ considered evidence from Dr. Windisch, a pediatrician, who performed "a comprehensive medical evaluation and assessment of Plaintiff's complaints of diabetes type 1 and food allergies for purposes of assessing Social Security disability."  Defendant's Motion at 17-19.  Defendant also contends that "[s]hould this Court disagree, however, any resulting error would be harmless.  *Id.* at 18 (citing *Molina v. Astrue*,

674 F.3d 1104, 1111 (9th Cir. 2012)).  With respect to Dr. O'Connor's functional assessment

report for Plaintiff that found no more than a moderate limitation in any of the six domains of

functioning, Defendant contends that the "ALJ properly concluded that Dr. O'Connor's opinion

was partially credible, but not to the extent of establishing disability." *Id.* at 18-19.

### III.     LEGAL STANDARD

When asked to review the Commissioner's decision, the Court takes as conclusive any

findings of the Commissioner which are free from legal error and supported by "substantial

evidence."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial

evidence means "more than a mere scintilla[,]" *id.*, but "less than a preponderance," *Desrosiers v.*

*Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (quoting *Sorenson v.*

*Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975)).  Even if the Commissioner's findings are

supported by substantial evidence, they should be set aside if proper legal standards were not

applied when weighing the evidence and reaching a decision.  *Benitez v. Califano*, 573 F.2d 653,

655 (9th Cir. 1978) (citing *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).  In reviewing the

record, the Court must consider both the evidence that supports and detracts from the

Commissioner's decision.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v.*

*Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### IV.     ANALYSIS

The Court separately considers whether the ALJ's decision was correct at Step Three in

finding that: (1) Plaintiff's impairments did not meet or medically equal the Listing, and (2)

Plaintiff's impairments did not functionally equal the Listing.  The Court also considers whether

the ALJ erred by not considering a comprehensive pediatric examination in reaching her decision.

#### A.     Whether the ALJ Erred at Step Three in Finding Plaintiff's Impairments Did Not Meet or Medically Equal Listing 109.08

The parties dispute whether the ALJ erred at Step Three in finding Plaintiff's impairments

did not meet or medically equal Listing 109.08 for diabetes mellitus.  For the reasons stated below,

United States District Court
Northern District of California

the Court finds that Plaintiff met Listing 109.08 for diabetes mellitus from the date the application for SSI benefits was filed to the date Plaintiff turned six-years-old.  Accordingly, Plaintiff is entitled to benefits for that limited period.

### 1.      Which Listing Applies

As discussed above, effective June 7, 2011, Listing 109.08 was amended to apply only to children under the age of six.  Under the "New Listing," children over the age of six must either meet another listing or functionally equal the listings under the criteria in 20 C.F.R. § 416.926a.  Under the "Old Listing," there was no age restriction precluding the application of the listing to children six and older, but the Old Listing did have additional criteria, requiring the claimant to prove:

> A.  Recent, recurrent hospitalizations with acidosis; or
> B.  Recent, recurrent episodes of hypoglycemia; or
> C.  Growth retardation as described under the criteria in 100.02 A or B; or
> D.  Impaired renal function as described under the criteria in 106.00ff.

20 C.F.R. § 404, Subpt. P, App. 1, Pt. B, § 109.08 (2011).  The ALJ decided Plaintiff's claim on July 29, 2011, and the Appeals Council affirmed that decision on February 21, 2012.  Both the ALJ's and the Appeals Council's decisions took place after the New Listing went into effect on June 7, 2011.

Plaintiff contends that only the Old Listing applies.  Plaintiff's Reply at 20 ("Plaintiff contends the new requirements are not binding at any time in this case, including the timeframe inclusive of the Court's findings and disposition.").  Defendant contends that both the Old Listing and the New Listing apply to Plaintiff's claim, and that the New Listing only governs Plaintiff's claim from the date in which it was in effect.  *See* Defendant's Motion at 11–12.  The Court disagrees with both Plaintiff and Defendant, and holds that the New Listing applies to the entire period relevant to Plaintiff's claim for benefits.

Defendant does not cite any authority for the proposition that the two versions of Listing 109.08 may apply to Plaintiff's claim.  Indeed, the SSA has instructed courts to take a different approach.  When the SSA published "Final Rules" containing the New Listing, the SSA included a

United States District Court
Northern District of California

section entitled "When will we use these final rules?"  That section provides:

> We will use these final rules beginning on their effective date.  We will continue to use the current listings until the date these final rules become effective.  *We will apply the final rules to . . . claims that are pending on . . . the effective date*.

76 Fed. Reg. 19692-01, 19692 (emphasis added).  A footnote to this section provides:

> This means that we will use these final rules on and after their effective date in any case in which we make a determination or decision.  We expect that Federal courts will review our final decisions using the rules *that were in effect at the time we issued the decisions.*

*Id.* at 19692 n. 3 (emphasis added).[14]  The SSA's rule suggests that New Listing for diabetes mellitus will apply to Plaintiff's claim because the New Listing became effective on June 7, 2011, before the ALJ's and the Appeals Council's decisions.  The application of the New Listing is also consistent with the general "rule that 'a court is to apply the law in effect at the time it renders its decision.'"  *Landgraf v. USI Film Products*, 511 U.S. 244, 264 (1994) (quoting *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 716 (1974)).

In *Landgraf*, the Supreme Court discussed the "apparent tension" between the general rule that courts are to apply the law in effect at the time the decision is rendered, and the "axiom that '[r]etroactivity is not favored in the law.'"  *Id.* (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  The issue in *Landgraf* was whether § 102 of the Civil Rights Act of 1991, which permits a party to seek compensatory and punitive damages under Title VII for intentional discrimination, applied to an employment discrimination case that was pending on appeal when the 1991 Act was enacted.  The Court articulated the following three-part test to determine whether a statute should be applied to conduct prior to its enactment:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.  If Congress has done so, of course, there is no need to resort to judicial default rules.

---

[14] The words "determination" and "decision" are terms of art defined by the SSA's regulations.  "Decision means the decision made by an administrative law judge or the Appeals Council."  20 C.F.R. § 416.1401.  "Determination means the initial determination or the reconsidered determination."  *Id.*

United States District Court
Northern District of California

25

1
2
3
4

> When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

5   *Landgraf*, 511 U.S. at 280. Applying this test, the Court held that (1) Congress had not expressly

6   prescribed the reach of § 102 of the Civil Rights Act of 1991, (2) the statute had a retroactive

7   effect because it exposed employers to monetary liability for acts which predated the statute's

8   enactment, and (3) the presumption against retroactively applied because there was no clear

9   congressional intent to apply the statute retroactively. *Landgraf*, 511 U.S. at 280-86.

10  Applying *Landgraf* to the case at bar, the first question is whether "*Congress* has expressly

11  prescribed the statute's proper reach." *Id.* (emphasis added). In this case, there is no indication

12  that Congress has spoken at all. Unlike in *Landgraf*, where a statute passed by Congress was at

13  issue, this case concerns a regulation promulgated by the SSA. This distinction is important

14  because while Congress may expressly provide that a statute applies retroactively so long as it is

15  consistent with constitutional restraints, *see Landgraf*, 511 U.S. at 267, "[i]t is axiomatic that an

16  administrative agency's power to promulgate legislative regulations is limited to the authority

17  delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Indeed,

18
19
20
21

> a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.... Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.

22  *Id.* at 208-09 (noting that the statutory provisions authorizing the Secretary of Health and Human

23  Services to promulgate regulations implementing Medicare "contain no express authorization of

24  retroactive rulemaking").

25  While the SSA promulgated a rule that requires the application of the New Listing to

26  Plaintiff's claim, there is no indication that Congress has authorized the SSA to promulgate

27  retroactive regulations. The authorizing statute grants the Commissioner of Social Security "full

28  power and authority to make rules and regulations and to establish procedures," but lacks any

26

express authorization for retroactive rulemaking.  42 U.S.C. § 405(a); *see also Combs v. Commissioner of Social Security*, 459 F.3d 640, 645 (6th Cir. 2006) (citing *Bowen*, 488 U.S. at 214 n. 3) ("While Congress has the power to permit the SSA to promulgate retroactive regulations, Congress generally has not done so.").  Therefore, the Court must proceed to the next step in the *Landgraf* analysis and consider whether applying the New Listing to Plaintiff's claim has a retroactive effect.

To consider whether the application of the New Listing has a retroactive effect, the Court must consider "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280.  "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, … or upsets expectations based in prior law." *Id*. at 269 (citations omitted).  Rather, the question is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id*. at 270.  This is because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265.  Thus, the presumption is most often applied to "provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Id*. at 271.  On the other hand, there are "diminished reliance interests in matters of procedure … [b]ecause rules of procedure regulate secondary rather than primary conduct." *Id*. at 275.

In *Combs v. Commissioner of Social Security*, the Sixth Circuit, sitting *en banc*, applied the principles in *Landgraf* to determine the retroactive effect of a change in the Social Security listing for obesity.  459 F.3d 640 (6th Cir. 2006) (*en banc*).  Prior to 1999, claimants who met certain criteria of the obesity listing were presumed disabled.  In 1999, however, the Social Security Administration deleted the obesity listing, and thereby increased the burden of proof for individuals claiming disability based on obesity.  The claimant in *Combs* filed her claim for disability in 1996, and had two hearings before an ALJ to determine her disability: first in 1999 when the obesity listing was still in effect, and again in 2003 (upon remand from the Appeals

*United States District Court*
*Northern District of California*

Council) after the obesity listing had been deleted.  The Sixth Circuit considered whether the ALJ that adjudicated the claimant's claim in 2003 erred by declining to apply the obesity listing that had been deleted in 1999.

The court was split.  The lead opinion held that applying the rules in effect in 2003 did not mean that those rules operated retroactively:

> The factors articulated in *Landgraf*—fair notice, reasonable reliance, and settled expectations—weigh against finding a retroactive effect…. It can hardly be argued that claimants become obese or otherwise become impaired in reliance on the availability of the presumption in the listing.  Nor is there any indication that they file their claims, or decide what to put in their claims, based on how the agency determines whether they meet the statutory requirements for disability eligibility.  Similarly, claimants have no settled expectation that the agency will use one as opposed to another algorithm for determining whether the statutory requirements are met.  Finally, there is no basis for claimants to argue that they need "fair notice" of a change in the step three presumptions.

*Combs*, 459 F.3d at 646.  The lead opinion believed the changed listing was procedural rather than substantive, writing that the difference lies in "whether there is a change in substantive obligation as opposed to a change in the way in which the same obligation is adjudicated."  *Id*.  The lead opinion held that the elimination of the obesity listing did not change "[t]he substantive requirements for disability," but "only the way in which the agency goes about determining whether they are present."  *Id*. at 647.

The five dissenting judges in *Combs* criticized the lead opinion, writing that it "seriously misapprehends and oversimplifies the Supreme Court's retroactivity jurisprudence."  *Combs*, 459 F.3d at 661 (Clay, J., dissenting).  The dissent noted that "[a]t the first hearing, had the ALJ correctly analyzed Plaintiff's impairments, he most likely would have found Plaintiff to be disabled."  *Combs*, 459 F.3d at 662 (Clay, J., dissenting).  The dissent argued the change in the listing caused the claimant to lose an irrebuttable presumption that she was disabled, and thereby increased her burden of proof, which caused a substantive change in the law.  *Id*. at 667.  The dissent believed that there was an impermissible retroactive effect because "the new obesity rules adversely affected Plaintiff's prospects for success on the merits" of her claim.  *Id*. at 669.  While the dissent agreed with the majority that the claimant did not rely on the obesity listing when

becoming disabled, this fact was not relevant.  Instead, it was important that the claimant "*planned*

for the possibility of becoming disabled in reliance on the disability benefits scheme available at

that time." *Id*. at 673 (emphasis added).

The *Combs* dissent found support in a case from this district.  *See id.* at 669 (citing *Kokal*

*v. Massanari*, 163 F.Supp.2d 1122, 1130 n. 6 (N.D. Cal. 2001) (Laporte, J.).  Similar facts were at

issue in *Kokal*: the obesity listing was deleted after the claimant's hearing before the ALJ but

before the Appeals Council considered the claimant's appeal.  The court wrote that "Plaintiff's

rights would be substantively altered if the revision [to the listings] was deemed applicable to

pending claims, because the revised regulation would raise the bar on proof of disability based on

obesity." *Id*. at 1131.  The court also noted that "Plaintiff likely satisfied the requirements of

Listing 9.09, automatically qualifying her for disability benefits." *Id*.  The court further wrote that

> the unfairness to Plaintiff is that she made her claim at a time when
> Listing 9.09 was in effect and, without the aid of an attorney,
> presented extensive evidence to the ALJ of obesity combined with
> other impairments that may well have qualified her as disabled
> under that Listing.  Through no fault of her own but through the
> ALJ's error in not considering whether she met Listing 9.09, she
> was found not disabled.  Subsequently, while pursuing her
> administrative appeal to the Appeals Council, the Listing was
> repealed and replaced with new, less favorable regulations regarding
> obesity.  The Appeals Council then erroneously failed to consider
> either the new or the old regulations in rejecting her appeal.

*Id*. at 1132.

The facts in this case are materially different from the facts in both *Combs* and *Kokal*.

Here, the New Listing was in effect by the time Plaintiff's claim was decided by the ALJ.  That

distinguishes this case from both *Comb* and *Kokal*, because when the claimants in those cases

were before the ALJ (for the first time, at least, for the *Combs* claimant), the obesity listing was

still in effect.  Both courts noted that if the ALJ had correctly applied the obesity listing in the first

instance, then the claimant would have been entitled to benefits.  *See Kokal*, 163 F.Supp.2d at

1132; *Combs*, 459 F.3d at 662 (Clay, J., dissenting).  It was *because* the ALJ erred that the

claimants were consequently subject to new rules due to the lapse in time.  In this case, however,

the New Listing was in effect when Plaintiff's case was before the ALJ.  While this does not

preclude the possibility that applying the New Listing will have a retroactive effect, it does

29

1   eliminate the unfairness factor of applying a change in the listings solely because the ALJ erred in

2   the first instance.

3          More importantly, however, is the fact that, in both *Combs* and *Kokal*, the claimants

4   planned on the disability scheme in effect at the time they filed their applications, and would likely

5   have satisfied the obesity listing criteria.  The *Kokal* court wrote that "Plaintiff's rights would be

6   substantively altered … because the revised regulation would raise the bar on proof of disability

7   based on obesity," *id*. at 1131, and noted that the plaintiff "likely satisfied the requirements of

8   Listing 9.09…."  *Kokal*, 163 F.Supp.2d at 1131.  Similarly, the *Combs* dissent believed that there

9   was an impermissible retroactive effect because the new obesity rules adversely affected

10  "Plaintiff's prospects for success on the merits," *id*. at 669, and noted that the claimant "*planned*

11  for the possibility of becoming disabled in reliance on the disability benefits scheme available at

12  that time."  *Id*. at 673 (emphasis added).  In this case, however, even if Plaintiff had planned her

13  case in expectation that the Old Listing applied, there is no evidence to suggest that she would

14  have prevailed on her claim because the evidence presented does not meet the criteria of the Old

15  Listing.

16          Plaintiff argues that she met the Old Listing because she had "[r]ecent, recurrent episodes

17  of hypoglycemia."  20 C.F.R. § 404, Subpt. P, App. 1, Pt. B, § 109.08 (2011).  The documentation

18  requirement to prove this condition requires the following:

19              Description of characteristic history, physical findings, and
                diagnostic laboratory data must be included.  Results of laboratory
20              tests will be considered abnormal if outside the normal range or
                greater than two standard deviations from the mean of the testing
21              laboratory.  Reports in the file should contain the information
                provided by testing laboratory as to their normal values for that test.
22

23  *Id*.  To show that she met the documentation requirement, Plaintiff cites the following evidence:

24  (1) a 14-day summary covering March 13, 2008 to March 26, 2008, showing that 12 out of 101

25  glucometer readings were below the hypoglycemic threshold of 67 mg/dL (AR 189-90); (2) a 14-

26  day summary covering April 14, 2010 to April 27, 2010, showing that four out of 44 glucometer

27  readings were below the hypoglycemic threshold of 67 mg/dL (AR 173-43); and (3) the

28  September 24, 2012 letter from Dr. O'Connor, which is not in the administrative record, and

United States District Court
Northern District of California

30

1 | which states that Dr. O'Connor has "witnessed [Plaintiff's] problems with recurrent bouts of

2 | hypoglycemia, frequent episodes of hyperglycemia, and ongoing difficulty with A1c levels,"

3 | (Plaintiff's Brief, Ex. E).

4 |       The evidence cited by Plaintiff does not show that Plaintiff had recent, recurrent episodes

5 | of hypoglycemia. First, the 14-day summary covering March 13, 2008 to March 26, 2008 does

6 | not show "recent" episodes of hypoglycemia because Plaintiff's claim was not filed until over a

7 | year later on August 24, 2009. Second, the 14-day summary covering April 14, 2010 to April 27,

8 | 2010, showing that four out of 44 glucometer readings were below the hypoglycemic threshold,

9 | does not show that Plaintiff met the documentation requirement for the Old Listing. Specifically,

10 | it does not show that Plaintiff's readings were "two standard deviations from the mean of the

11 | testing laboratory." In any event, on April 27, 2010, Plaintiff's treating physician noted that

12 | Plaintiff had not experienced any "severe hypoglycemia" since Plaintiff's last visit. AR 169. In

13 | May of 2009, Plaintiff's mother told the consultative examiner that Plaintiff had "intermittent

14 | highs" and "occasional lows." AR 139.

15 |       Dr. O'Connor's September 24th letter does not change this result. The letter was never

16 | submitted to the ALJ or the Appeals Council, and therefore, is not part of the administrative

17 | record. *See Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012). While

18 | the Court may remand this case to consider additional evidence, the Court may only do so "upon a

19 | showing that there is new evidence which is material and that there is good cause for the failure to

20 | incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Dr.

21 | O'Conner's letter is not "material" because it does not meet the documentation requirement for the

22 | Old Listing.

23 |       Accordingly, the Court finds that Plaintiff does not meet the criteria of the Old Listing.

24 | There are no "new legal consequences" when the New Listing is applied to Plaintiff's claim, and,

25 | consequently, there is no "retroactive effect." Therefore, the Court will apply the New Listing to

26 | Plaintiff's claim. In doing so, the Court follows the SSA's rule to apply the listing in effect at the

27 | time of the ALJ's decision, which is also consistent with the general "rule that 'a court is to apply

28 | the law in effect at the time it renders its decision.'" *Landgraf*, 511 U.S. at 264 (quoting *Bradley*,

United States District Court
Northern District of California

United States District Court
Northern District of California

1   416 U.S. at 716).

2           **2.      Whether Plaintiff's Impairment Meets or Medically Equals the New
3                     Listing**

4           The New Listing includes "[a]ny type of diabetes mellitus in a child who requires daily

5   insulin and has not attained age 6 [will be] consider[ed] under a disability until the attainment of

6   age 6." 20 C.F.R. § 404, Subpt. P, App. 1, Pt. B, § 109.08.  The only requirements to meet the

7   New Listing are that a child be under the age of six, be diagnosed with diabetes mellitus, and meet

8   the durational requirement that the impairment last for twelve months.  *See id.*; 20 C.F.R. §

9   416.924(a), (d).

10          Plaintiff's mother filed the claim for SSI benefits on Plaintiff's behalf on August 24, 2009.

11  At the time, Plaintiff was only five years old, and had been diagnosed with diabetes mellitus since

12  January 1, 2006.  Between the date in which the application was filed (August 24, 2009) and the

13  date in which Plaintiff turned six-years-old (February 11, 2010), Plaintiff satisfied all the criteria

14  of the New Listing.  Therefore, Plaintiff is entitled to receive SSI benefits for this time period.

15          While Plaintiff also satisfied the criteria of the New Listing prior to the date in which the

16  application was filed, she did not become eligible to receive SSI benefits until she filed the

17  application.   "Under title XVI, there is no retroactivity of payment."  Social Security Rule

18  ("SSR") 83–20; *see also* 20 C.F.R. § 416.202 (requiring a claimant to file an application for SSI

19  benefits to become eligible for SSI).  Rather, SSI payments "are prorated for the first month for

20  which eligibility is established after application and after a period of ineligibility."  SSR 83-20;

21  *see also* 20 C.F.R. § 416.501 ("Payment of SSI benefits will be made for the month after the

22  month of initial eligibility and for each subsequent month provided all requirements for eligibility

23  (see § 416.202) and payment (see § 415.420) are met."); *Van Hoosen v. Astrue*, No. 09-6314, 2011

24  WL 3299845 (D. Or. July 8, 2011) *report and recommendation adopted*, No. 09-6314, 2011 WL

25  3322515 (D. Or. Aug. 2, 2011) ("The filing date of a claimant's application determines the earliest

26  date for which benefits can be paid under Title XVI, because supplemental security income

27  payments cannot be made retroactively."); *Lara v. Astrue*, No. 11-0129, 2012 WL 4442255, at *1

28  (N.D. Tex. Sept. 25, 2012) (affirming the ALJ's finding that "supplemental security income was

1   not payable prior to the application date . . . ."); *Hayes v. Sec'y of Health & Human Servs.*, 653 F.

2   Supp. 551, 552 (W.D. Penn. 1987) (finding the plaintiff to be disabled and directing the

3   Commissioner to pay the plaintiff benefits from the date of the application).

4          After Plaintiff turned six-years-old, she no longer satisfied the criteria to meet the New

5   Listing.  If the child is above the age of six, the Court must "follow [the] rules for determining

6   whether the [diabetes mellitus] is severe, alone or in combination with another impairment,

7   whether it meets or medically equals the criteria of a listing in another body system, or

8   functionally equals the listings under the criteria in § 416.926a, considering the factors in §

9   416.924a."  20 C.F.R. § 404, Subpt. P, App. 1, Pt. B, § 109.00C.  Plaintiff does not argue that she

10  meets any other listing than the listing for diabetes mellitus.  Therefore, the Court finds that

11  Plaintiff does not meet any listing starting with the day she turned six-years-old.

   **B.       Whether the ALJ Erred at Step Three in Finding Plaintiff's Impairments Did
              Not Functionally Equal the Listing**

14         As explained in further detail above, even if the claimant does not meet a listing, she may

15  still be considered disabled if an impairment results in limitations that "functionally equal the

16  listings." 20 C.F.R. § 416.926a(a).  Because Plaintiff does not meet the New Listing after the day

17  in which she turned six-years-old, the Court must consider whether the ALJ erred in finding that

18  Plaintiff did not "functionally equal" the listings by assessing the claimant's functioning in six

19  domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting

20  and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and

21  (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  To "functionally equal" a listing,

22  the impairment(s) must result in "marked" limitations in two domains of functioning or an

23  "extreme" limitation in one domain.  *Id.* § 416.926a(a), (d).

24         The ALJ found that Plaintiff had a "marked" limitation in the domain of "health and well-

25  being," but no limitation in the other five domains.  AR 18-19.  Plaintiff argues that the ALJ erred

26  in not finding that she also has a "marked" limitation in the domain of "caring for yourself."

27  Plaintiff contends she has a "marked" limitation in that domain because she cannot administer

28  insulin injections on herself, count carbohydrates and sugars, and perform blood sugar tests.  The

United States District Court
Northern District of California

33

1    Court finds that Plaintiff's inability to perform such tasks is normal for a child of her age, and

2    therefore affirms the ALJ's finding that there is no marked limitation in this domain.

3            To determine a child's functional equivalency to the Listing for the purpose of determining

4    eligibility for SSI benefits, the ALJ must examine "how appropriately, effectively, and

5    independently [Plaintiff] perform[s] [her] activities *compared to other children [Plaintiff's] age*

6    *who do not have impairments*." 20 C.F.R. § 416.926a(b) (emphasis added).  In other words, for

7    Plaintiff to have a "marked" limitation in the domain of caring for herself, Plaintiff must be

8    limited in her ability to care for herself as compared to other children of Plaintiff's age.  The

9    SSA's regulations provide specific, age-appropriate examples of what activities are expected of

10   school-age children to care for themselves:

11               You should be independent in most day-to-to activities (e.g.,
                 dressing yourself, bathing yourself), although you may still need to
12               be reminded sometimes to do these routinely.  You should begin to
                 recognize that you are competent in doing some activities and that
13               you have difficulty doing others.  You should be able to identify
                 those circumstances when you feel good about yourself and when
14               you feel bad.  You should begin to develop understanding of what is
                 right and what is wrong, and what is acceptable and unacceptable
15               behavior.  You should begin to demonstrate consistent control over
                 your behavior, and you should be able to avoid behaviors that are
16               unsafe or otherwise not good for you.  You should begin to imitate
                 more of the behavior of adults you know.
17

18   *Id.* § 416.926a(k)(2)(iv).  Notably, the regulations do not suggest that school-aged children should

19   be able to administer insulin shots, count carbohydrates and sugars, and perform blood sugar tests.

20   The average school-aged child cannot perform these tasks.  Thus, the fact that Plaintiff cannot

21   perform these tasks does not equate to a marked limitation in the domain of caring for oneself.  20

22   C.F.R. § 416.926a(b).  Rather, the question is whether Plaintiff can care for herself by performing

23   tasks expected of children her age.

24           The Court finds that the ALJ's decision that Plaintiff does not have a marked limitation in

25   this domain was based on "substantial evidence." 42 U.S.C. § 405(g).  Plaintiff's mother testified

26   that Plaintiff was "really active," liked to ride her bicycle, and assisted with chores around the

27   house such as feeding the dogs and making her bed.  AR 17, 43, 167.  Both Dr. Henry (on May 6,

28   2009) and Dr. Quint (on July 12, 2010) concluded that Plaintiff had no limitation in the domain of

United States District Court
Northern District of California

34

caring for oneself.  *Id.* at 146, 193.  On December 30, 2009, Dr. Nawar found that Plaintiff had a "less than marked" limitation in the domain of caring for oneself.  *Id.* at 163.  Moreover, on February 4, 2011, Dr. O'Connor noted in her report that Plaintiff "is not old enough yet to count carbohydrates, decide on insulin dose, and give injections independently."  AR 198.  Thus, the ALJ correctly found that Plaintiff's inability to perform the tasks above "appear to be related primarily to the claimant's young age, rather than to any disabling medical condition."  *Id.* at 17. Accordingly, the ALJ properly concluded that Plaintiff's impairments did not functionally equal the Listing.

### C.    Whether the ALJ Erred by Not Considering a Comprehensive Pediatric Examination in Reaching Her Decision

Plaintiff also contends that the ALJ committed legal error by not making a reasonable effort "to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability of the individual (as determined by the Commissioner of Social Security) evaluates the case of such individual."  42 U.S.C. § 1382c(a)(3)(I).  In *Howard ex rel. Wolff v. Barnhart*, the Ninth Circuit interpreted § 1382c, and held that it was insufficient for an ALJ to rely on individual evaluations and separate reports.  341 F.3d 1006, 1014 (9th Cir. 2003).  The *Howard* court wrote that an "ALJ is required to make a reasonable effort to obtain a *case evaluation, based on the record in its entirety*, from a pediatrician or other appropriate specialist, rather than simply constructing his own case evaluation from the evidence in the record."  *Id.* (emphasis added).

In response to *Howard*, the SSA issued the Acquiescence Ruling 04-1(9) to explain how the SSA's interpretation of § 1382c(a)(3)(I) differs from the Ninth Circuit's interpretation in *Howard*.  *See* SSAR 04-1(9), 69 Fed. Reg. 22578-03 (Apr. 26, 2004).  Acquiescence Rulings are a subset of Social Security Rulings, which do not carry the "force of law," but are binding on ALJ's. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009).  They "reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations."  *Avenetti v. Barnhart,* 456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart,* 420 F.3d 1002, 1005 n. 2 (9th Cir. 2005)).

United States District Court
Northern District of California

1    In the Acquiescence Ruling 04-1(9), the SSA disagreed with the Ninth Circuit's "broad"

2    interpretation of § 1382c(a)(3)(I), which expressly applies to the "Commissioner of Social

3    Security" when making a "determination."  42 U.S.C. § 1382c(a)(3)(I).  The SSA wrote that "[t]he

4    words 'determination' and 'decision' are terms of art … the word 'determination' means the initial

5    determination or reconsidered determination, while the term 'decision' means the decision made

6    by the ALJ or Appeals Council.  Therefore, the SSA interprets § 1382c(a)(3)(I) to apply "only to

7    determinations made by a State agency and not to decisions made by ALJs or AAJs (when the

8    Appeals Council makes a decision)."  SSAR 04-1(9), 69 Fed. Reg. 22578-03 (Apr. 26, 2004).  The

9    SSA explained how it would apply the *Howard* decision within the Ninth Circuit:

> For cases that are subject to this Ruling, ALJs and AAJs (when the
> Appeals Council makes a decision) must make reasonable efforts to
> ensure that a qualified pediatrician or other individual who
> specializes in a field of medicine appropriate to the disability of the
> individual (as identified by the ALJ or AAJ) evaluates the case of
> the individual.  To satisfy this requirement, the ALJ or AAJ may
> rely on a case evaluation made by a State agency medical or
> psychological consultant that is already in the record, or the ALJ or
> AAJ may rely on the testimony of a medical expert.  When the ALJ
> relies on the case evaluation made by a State agency medical or
> psychological consultant, the record must include the evidence of
> the qualifications of the State agency medical or psychological
> consultant.  In any case, the ALJ or AAJ must ensure that the
> decision explains how the State agency medical or psychological
> consultant's evaluation was considered.

18    SSAR 04-1(9), 69 Fed. Reg. 22578-03 (Apr. 26, 2004).

19    Therefore, to satisfy the requirements of § 1382c(a)(3)(I), as interpreted by *Howard* and

20    the Acquiescence Ruling 04-1(9), the ALJ was required to "make reasonable efforts to ensure that

21    a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the

22    disability of the individual … evaluates the case of the individual," and was entitled "to rely on a

23    case evaluation made by a State agency medical … consultant that is already in the record."  *Id*.

24    The Commissioner contends that the ALJ satisfied this requirement with Dr. Windish, who is a

25    pediatrician and performed a 5-year Well Child Exam on Plaintiff, the results of which are in the

26    Administrative Record.  Dr. Windish did not, however, perform a case evaluation for Plaintiff, and

27    the ALJ did not mention Dr. Windish in her opinion.  In addition, while the ALJ relied on case

28    evaluations made by State agency medical consultants (Drs. Henry, Nawar, and Quint), there is no

36

1   indication in the record that any one of these consultants is a "qualified pediatrician or other

2   individual who specializes in" diabetes.

3          Even if the ALJ erred in this respect, the Court finds that such error would be harmless as

4   it "was inconsequential to the ultimate nondisability determination."   *Stout v. Comm'r, Soc. Sec.*

5   *Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).  It is clear that after Plaintiff turned six, she could no

6   longer meet the New Listing for diabetes mellitus.  With respect to the domains, Plaintiff only

7   argues that the ALJ should have found a marked limitation in "caring for oneself," and makes no

8   argument regarding the other domains.  Plaintiff's mother testified that Plaintiff was an active

9   child and did not indicate that Plaintiff was limited in her ability to care for herself when

10  compared to children of her own age, except Plaintiff's inability to perform adult-tasks such as

11  injecting insulin, counting carbohydrates, and performing blood tests.  Thus, even if a pediatrician

12  or diabetes specialists had performed a case evaluation for Plaintiff, there was no evidence in the

13  record to support a marked limitation in caring for oneself.

14  **V.     CONCLUSION**

15         For the foregoing reasons, the Motions for Summary Judgment are GRANTED in part and

16  DENIED in part.  The case is REMANDED for the calculation of benefits consistent with this

17  Order.

18         **IT IS SO ORDERED.**

19  Dated: January 7, 2014

20  _____

21  JOSEPH C. SPERO
    United States Magistrate Judge

22

23

24

25

26

27

28